Filed 7/8/26  P. v. Ruiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RICHARD RUIZ, <br><br> Defendant and Appellant. | H051161, H051551 <br> (Monterey County <br> Super. Ct. No. 21CR001219) |

Defendant Richard Ruiz was convicted by jury of first degree willful, deliberate, and premeditated murder.  He was sentenced to 26 years to life in prison and, following a later restitution hearing, ordered to pay $4,727.39 in victim restitution.  He has separately appealed from the judgment of conviction and the post-judgment restitution order.  As to the conviction, he contends his conviction must be reduced to second degree murder due to insufficient evidence of premeditation and deliberation.  As to the restitution order, appointed counsel has filed an opening brief summarizing the restitution proceedings but raising no issues.  As we will explain, we agree with that defendant's first degree murder conviction must be reduced to second degree murder and will therefore reverse the judgment.  Having reviewed the record of the restitution proceedings, we find no arguable issue and will affirm the restitution order.

## I.  TRIAL COURT PROCEEDINGS

Defendant was charged with murder for the killing of Gabriela Guzman.  It was alleged that defendant personally used a knife in committing the offense.  (Pen. Code,

§ 12022, subd. (b)(1).) Two aggravating factors were also alleged: that the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)) and that defendant was armed with or used a weapon at the time of the commission of the crime (Cal. Rules of Court, rule 4.421(a)(2)).

## A. TRIAL EVIDENCE

### 1. Defendant's Relationship with Guzman

Defendant and Guzman began dating in 2018 and lived together in Salinas starting in 2019. Guzman's son testified that he noticed "negative changes" in his mother's demeanor after she began dating defendant. Guzman's daughter-in-law described defendant as "accusatory" and "controlling" toward Guzman.

Guzman called 911 in June 2019. She did not say anything to the dispatcher, but could be heard asking defendant to leave. Police responded to their apartment and interviewed both of them. Guzman said defendant had "snapped" while they were watching television, yelled at her, and grabbed her face. She was scared and wanted him to leave, but he would not. According to Guzman, defendant had attributed his conduct to "a voice" he was hearing. Defendant told officers he had verbally "confronted" Guzman about "a hickey on her butt" but had not touched her.

Guzman called 911 again in April 2020. She told the dispatcher that her "ex-boyfriend" (referring to defendant) was not letting her leave the home but that nothing physical had happened "yet." When police responded, Guzman told an officer that defendant would not let her go to work because he believed she was cheating on him. Guzman said she was "tired of the fighting" and that defendant should know she was not seeing anyone else, because he was constantly tracking her location to know where she was at all times.

The couple broke up in August 2020 and resumed their relationship in October or November. Guzman's daughter-in-law described that while she was on vacation with

2

Guzman in October, defendant "constantly had to be in contact with her, via video, and/or texting, and/or calling her."

Guzman called 911 a third time in November 2020. She told the dispatcher that her "ex" (defendant) was "being aggressive" and "threatening" her. In Guzman's words, defendant was "being violent" and "getting in my face," and she believed it would "get worse." Based on security footage that was not visible on Guzman's phone, defendant again accused Guzman of cheating on him.

In December 2020, defendant and Guzman bought a truck together. By February 2021, Guzman was applying for jobs in the state of Washington (where her son and daughter-in-law lived) and planning to move there. Guzman's son had talked to her about the planned move to Washington, but they did not discuss whether defendant would also be moving. Defendant testified that Guzman had planned for both of them to move together, but he decided not to move with her because he knew their relationship would not last.

A neighbor testified that he had talked to defendant in early February 2021 while they were both retrieving mail from a communal mailbox. Defendant told his neighbor that "his fiancée was cheating on him" and "he was concerned about that." The neighbor "offered to pray with him and try to bring a little bit of peace into his mind," and defendant agreed. During the conversation, defendant said he was unemployed and Guzman was financially supporting him. After praying with his neighbor, defendant "said he felt peace" and walked away.

## 2. The Murder and Investigation

When Guzman did not show up to work on February 17, 2021, her boss called her son, who had not spoken with his mother since February 12. Guzman had previously shared the location of her cell phone with her daughter-in-law, who saw that the phone's last recorded location was Guzman's home. After Guzman's son and daughter-in-law tried unsuccessfully to contact her, they called police. Responding officers found

3

Guzman's body in an upstairs bedroom of her home. She appeared to have been dead for some time. She had been stabbed multiple times in the face and neck, and there was blood on the floor as well as blood spatter on the walls. Her head also showed signs of blunt force trauma. A Starbucks cup was on the floor, and there was a brown stain next to it.

Before police entered the house, an officer spoke to defendant on the phone and asked him for a key. Defendant said he was in Humboldt County and had last seen Guzman when they "got in an argument" on February 13. Since then, defendant had "just been driving" and had been involved in a car accident; he had not spoken to Guzman. Officers later determined that defendant had stayed at a hotel in Eureka on February 16. On February 14, defendant had struck a pedestrian with his truck at a rest stop near Emigrant Pass. Defendant apologized, said he was drunk, and asked the pedestrian not to call the police.

Later on February 17, defendant called 911 in Monterey County. Defendant told the dispatcher he had been "driving everywhere" since he last saw Guzman on February 13. He said he was driving back from Humboldt and was "almost in Frisco." According to defendant, Guzman was dating a Nuestra Familia gang associate named T.A. and her house was "bugged." Defendant also mentioned a Nuestra Familia gang member named H.L.[1] He said Guzman and T.A. had "put a hit" on him.

The dispatcher transferred defendant to a detective investigating the case. Before the detective asked any questions, defendant began explaining his relationship with Guzman. Defendant said he knew T.A. and H.L. from Gilroy, where he grew up. He explained that he "got in an argument" with Guzman on February 13. They had planned to go out to dinner that night, but defendant instead "brought her home" where Guzman

---

[1] Consistent with rule 8.90 of the California Rules of Court, we refer by initials to individuals whose only apparent connection to the case is defendant's suggestion that they may have been involved in Guzman's murder.

4

told him, "we can't do this no more." Defendant said that after the argument, he started smoking and drinking for the first time since 2008. When the detective asked defendant where he was, defendant said he was "uneducated" and did not "know how to use a map" or "know how to use computers."

Detectives traced defendant's cell phone to San Martin, where they found his truck parked on an off-ramp. Defendant was standing nearby, still talking on the phone. Eventually, he got back on the highway and began driving south. Officers followed him and attempted to make a traffic stop, but defendant continued driving at or below the speed limit for over 30 miles until a spike strip deflated his tires. As officers arrested defendant, he asked them, " 'What's wrong with Gabby?' "

Officers found two knives in defendant's truck, including a buck knife. They also found two knives at Guzman's home. All four knives tested negative for blood.

### 3. Security Camera Footage

Motion-activated cameras recorded Guzman and defendant leaving the house together shortly before 2:00 p.m. on February 13. They returned to the house shortly after 3:30 p.m. and Guzman walked upstairs alone at 3:38 p.m. She was holding a cup and wiped her face with a tissue. After Guzman went upstairs, defendant was recorded walking up and down the stairs several times. One recording shows him walking upstairs at 4:02 p.m.; after he reaches the top of the stairs, audio of someone talking can be heard. He walked upstairs again at 4:11 p.m. and next appeared on video at 4:51 p.m., when he walked downstairs wearing different clothing. Defendant went in and out of the house several times and was last captured on video at 6:08 p.m., when he appeared to retrieve an object from outside and go back into the house.

### 4. Expert Testimony

A licensed marriage and family therapist testified as an expert on intimate partner violence. He explained that intimate partner violence may begin with nonphysical actions like imposed isolation, emotional and verbal abuse, or threats. Physical violence

5

typically "starts out low and infrequent" but may escalate over time. Abusive relationships are often characterized by a cycle of violence wherein tension builds over time, a violent episode occurs, and the parties then reconcile after the abuser shows remorse. The cycle may repeat itself numerous times before the relationship finally ends.

### 5. Defense Case

Defendant testified on his own behalf and denied involvement in the killing. He said he moved out of the house he shared with Guzman in September 2020 because he believed Guzman was cheating on him. Defendant moved back in with Guzman in November 2020. He described an incident he said happened around February 9, 2021, when he saw Guzman talking to two men outside the house. One of the men was H.L., the nephew of a woman with whom defendant had a child. Defendant had not seen H.L. since 1987 or 1988, when H.L. would have been about seven or eight years old, but had seen pictures of him and believed H.L. was a Nuestra Familia gang member. He also believed H.L. had dated Guzman and stolen jewelry from her. After seeing Guzman talking to H.L., defendant believed H.L. was planning to kill him.

According to defendant, he and Guzman left the house on February 13, 2021 for a planned excursion. They had initially planned to visit the Sonora mountains, but Guzman "changed her mind" and they instead headed south. They planned to eat dinner at Cracker Barrel and stay on the coast for one or two nights. According to defendant, the trip was not intended to be a romantic getaway but "was actually a goodbye" and he "already knew that this would be our last time together." Defendant and Guzman stopped at Starbucks on the way; Guzman bought a drink but defendant did not, which upset Guzman. They argued as they continued driving south, then turned around in Greenfield and returned to Salinas. Guzman told defendant, " 'I can't do this no more.' "

Explaining the security video footage, defendant testified that when he and Guzman returned to the house, he was planning to gather his belongings and leave. He walked through the house, debating whether to take the truck that was parked in the

6

driveway or a motorcycle that was parked in the garage. Guzman had taken the garage door remote and a buck knife from the truck, so defendant went upstairs to retrieve them. Defendant said Guzman would not give him the remote or the knife, but did ask him not to leave. He recalled changing into thermal clothing because he intended to take the motorcycle. Before leaving, defendant found a beer bottle outside that he believed had been left there by H.L. or his companion days earlier. Defendant brought the bottle inside, intending to take it with him when he left so he would have fingerprint evidence of H.L.'s visit to the house. He later left in the truck, forgetting the beer bottle.

After leaving Salinas, defendant drove to Watsonville, San Jose, and Half Moon Bay. He then drove to Reno, where he camped for a night. He recounted an incident near Emigrant Pass in which a pedestrian falsely claimed to have been struck by defendant's truck. After leaving Reno, defendant drove to Eureka and checked in at a hotel where he also did laundry. On February 16, defendant called Eureka police and said he was "on the run" from Guzman, T.A., and H.L. Defendant described that after he notified police, "the dudes" approached him at a mall in Eureka and one of them told him, " 'You're a rat.' " The next day, after learning about Guzman's disappearance, defendant began driving back to Salinas and called 911 on the way.

Defendant's sister, brother, and friend testified to their observations of defendant's relationship with Guzman. According to their testimony, defendant and Guzman seemed happy together.

### B. SENTENCING AND RESTITUTION PROCEEDINGS

The jury found defendant guilty of first degree murder based on a finding of premeditation and deliberation. The jury also found true the special allegation that defendant personally used a knife, as well as both alleged aggravating sentencing factors. The trial court sentenced defendant to 25 years to life in prison for first degree murder, consecutive to a one-year sentencing enhancement for his use of a knife. At the June 2023 sentencing hearing, the court found defendant "young enough and able enough

7

to potentially earn funds in prison" and imposed a $9,500 restitution fine. The court also ordered victim restitution in an amount to be determined.

At a November 2023 restitution hearing, the prosecution requested $4,727.39 in victim restitution to Guzman's family for funeral and burial expenses. Defense counsel did not object to the trial court's consideration of the request, presented no evidence, and made no argument concerning the appropriate amount of restitution. Defendant personally addressed the court and appeared to reference *People v. Dueñas* (2019) 30 Cal.App.5th 1157, prompting clarification from the court and defense counsel that *Dueñas* addressed a restitution fine rather than direct victim restitution. The court ordered victim restitution in the requested amount of $4,727.39.

## II. DISCUSSION

### A. EVIDENCE OF PREMEDITATION AND DELIBERATION

Defendant contends his conviction must be reduced to second degree murder because the evidence is insufficient to support the jury's finding of premeditation and deliberation. "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We presume the "existence of every fact that the trier of fact could reasonably deduce from the evidence" to support the judgment. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) To overturn a jury's finding, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Here, there was not sufficient substantial evidence from which a jury could find defendant guilty of first degree murder.

The California Supreme Court has described premeditation and deliberation as generally established through: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and

8

explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim," and "(3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).) The evidence of premeditation and deliberation is generally sufficient "when there is evidence of all three types" or "at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.) The court has more recently emphasized that the factors discussed in *Anderson*, "while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) For example, post-killing conduct that is "inconsistent with a state of mind that would have produced a rash, impulsive killing" can also be considered. (*Id.* at p. 1128.)

Applying the *Anderson* factors here, we first acknowledge the ample evidence of defendant's possible motive to kill Guzman. Defendant and Guzman were in a romantic relationship characterized by defendant's abusive and controlling behavior, and the relationship was at or reaching its end on the day of the murder. Based on defendant's conduct throughout the relationship, a jury could reasonably infer a motive to maintain control by murdering Guzman rather than allowing the relationship to end peacefully. (Cf. *People v. Williams* (2018) 23 Cal.App.5th 396, 410.) But the existence of a plausible motive is not alone sufficient to establish premeditation and deliberation.

Although the evidence of defendant's motive is strong, the other evidence does not sufficiently complement it. There was no evidence of any planning activity before the day of the murder. While we acknowledge that "planning activity occurring over a short

9

period of time is sufficient to find premeditation" (*People v. Sanchez* (1995) 12 Cal.4th 1, 34), the Attorney General's assertion that defendant planned the murder immediately beforehand relies on speculation and not substantial evidence. Even absent any evidence defendant "was thinking about killing Guzman before their fight began," the Attorney General argues "the fight itself was long enough" for defendant to "have reflected on his actions before escalating the abuse by procuring and using a knife." But the mere passage of sufficient time for reflection does not establish that defendant actually used that time to plan or deliberate. We see no evidence of defendant affirmatively obtaining a knife for the purpose of attacking Guzman at any point during their argument. (Cf. *People v. Elliot* (2005) 37 Cal.4th 453, 471 [jury could infer that Elliot, who "told others shortly before the killing that he had a new knife," acquired the knife to carry out the killing].) Although the Attorney General correctly notes the jury was free to reject defendant's testimony that Guzman had taken his buck knife, it does not necessarily follow that defendant in fact armed himself with that (or any other) knife to carry out a planned attack on Guzman. " 'Disbelief of defendant's testimony, without more, does not constitute "other facts" from which logically flows the conclusion, beyond a reasonable doubt, that defendant did that which he denied doing.' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266, citing *People v. Velazquez* (2011) 201 Cal.App.4th 219, 231.)

The Attorney General also argues defendant "had time to reflect after stabbing Guzman the first time, and instead of stopping, proceeded to stab her several more times." But the argument presumes without supporting evidence that defendant had an opportunity to reflect during the fatal attack, and it collapses *Anderson*'s distinction between " 'planning' activity" and "*manner* of killing." (See *Anderson*, *supra*, 70 Cal.2d at p. 27.) When evidence about the stabbing itself is viewed properly as relating to the latter *Anderson* factor, the evidence is at best ambiguous regarding premeditation and deliberation. The Attorney General points to cases in which first degree murder

10

convictions were upheld on assertedly similar facts relating to the manner of killing. But in those cases, unlike here, the killer used multiple weapons (see *People v. Cruz* (1980) 26 Cal.3d 233, 245; *People v. Combs* (2004) 34 Cal.4th 821, 851) or admitted to trapping the victim in an enclosed space before the killing occurred (see *People v. Booker* (2011) 51 Cal.4th 141, 173–174).

"Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder." (*People v. Alcala* (1984) 36 Cal.3d 604, 626.) Nothing about the brutality of the killing here is inherently inconsistent with the mental state required for first degree murder, and it does not preclude a finding of premeditation and deliberation if accompanied by sufficient evidence of planning activity. Indeed, first degree murder convictions have been upheld for similarly brutal knife attacks. (See *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118, citing *Perez*, *supra*, 2 Cal.4th 1117.)[2] But the specific method of killing here (repeated stabbing to the face and neck with a single weapon) "is, at least in a vacuum, associated with someone losing his mind and going berserk, which is not a state of mind we associate with premeditation or deliberation." (*Nazeri*, at p. 1118.) That is especially so under the circumstances of the murder, which both parties describe as following a verbal argument between defendant and Guzman. Without more, the manner of killing was not "so particular and exacting" as to support an inference that defendant "must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way[.]" (*Anderson*, *supra*, 70 Cal.2d at p. 27.)

---

[2] Significantly, although not mentioned by the *Nazeri* court, the evidence in *Perez* supported an inference that the killer attacked the victim in her home with a steak knife and searched the house for another knife to continue his attack after the steak knife broke. (*Perez*, *supra*, 2 Cal.4th at pp. 1126–1127.) The California Supreme Court described that conduct as similar to "reloading a gun or using another gun when the first one has run out of ammunition." (*Id.* at p. 1127.)

11

Defendant's post-killing conduct was not "inconsistent with a state of mind that would have produced a rash, impulsive killing." (*Perez*, *supra*, 2 Cal.4th at p. 1128.) (We not it is not clear which, if any, portions of the surveillance video footage depict defendant's post-killing conduct, as Guzman's time of death was not established to that level of specificity.) The Attorney General focuses on the evidence of defendant's flight and contends his "attempts to distance himself from the crime supported the jury's conclusion that the attack was deliberate, not the result of a rash, unconsidered act." But the same evidence is consistent with a conclusion that defendant, having impulsively murdered Guzman without premeditation and deliberation, only then decided to flee and concocted a bizarre story about a conspiracy against him in an ill-conceived attempt to evade responsibility for the unplanned killing. "In the context of the sufficiency of the evidence to support a finding of premeditated and deliberate murder," the California Supreme Court has stated that "evidence of a defendant's attempts to conceal the crime by cleaning up the crime scene or telling false stories 'is highly probative of whether defendant committed the crime, but it does not bear upon the state of the defendant's mind at the time of the commission of the crime.'" (*People v. Thompson* (2010) 49 Cal.4th 79, 113, citing *Anderson*, *supra*, 70 Cal.2d at p. 33.)

We also note that an unjustified killing is presumed to be *second degree* murder, not first degree murder. (*Anderson*, *supra*, 70 Cal.2d at p. 25.) The prosecution thus bore the burden to prove beyond a reasonable doubt that the killing was premeditated and deliberate. (*Ibid.*) A possible motive for the murder was well established by the evidence. But as we have explained, other evidence concerning planning activity and the manner of killing would support a finding of premeditation and deliberation only in combination with weaker inferences and speculation. We acknowledge that much of that evidence could under different circumstances be consistent with a finding of premeditation and deliberation. But on this record, the evidence was not sufficient to support that finding beyond a reasonable doubt. We will therefore reverse the judgment

and direct the trial court to reduce the conviction to second degree murder. (See Pen. Code, §§ 1260 and 1181, subd. (6) ["When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."]. See also *People v. Bassett* (1968) 69 Cal.2d 122, 148: "[W]e find no substantial evidence to support the verdicts of murder in the first degree. The evidence does support, however, a conviction of murder in the second degree, and it is our duty to modify the judgment accordingly.")

## B. NO ARGUABLE APPELLATE ISSUE AS TO VICTIM RESTITUTION

In a separate appeal from the post-judgment restitution order, appointed counsel filed an opening brief summarizing the restitution proceedings but raising no issues. We notified defendant of his opportunity to submit written argument on his own behalf, and he has not done so. Consistent with *People v. Wende* (1979) 25 Cal.3d 436, we have reviewed the entire record of the restitution proceedings and find no arguable issue on appeal.

## III. DISPOSITION

The judgment is reversed and the matter remanded for the trial court to reduce the first degree murder conviction to second degree murder and to resentence defendant accordingly. The restitution order is affirmed.

_____
Grover, Acting P. J.

**WE CONCUR:**


_____
Lie, J.


_____
Wilson, J.


H051161, H051551
*People v. Ruiz*